IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| LORI COLVEY,<br><br>      Plaintiff,<br><br> vs.<br><br>CITY OF NORFOLK, a Political Subdivision; NORFOLK POLICE DIVISION, a Political Subdivision and Department of the City of Norfolk, Madison County, Nebraska; JASON WITZEL, BRENT TIETZ, and CHAD REIMAN, Individually and in Their Official Capacities as Police Officer for Norfolk, Madison County, Nebraska;<br><br>      Defendants. | 8:13CV1<br><br><br>**MEMORANDUM AND ORDER** |

This matter is before the court on defendants' motion for summary judgment pursuant to Fed. R. Civ. P. 56. Filing No. 51. Plaintiff filed an opposition to the motion. Filing No. 60. Plaintiff alleges the defendants violated her Fourth Amendment rights under 42 U.S.C. § 1983, violated her civil rights to privacy, committed negligence under state law, and are liable for municipal claims against the City of Norfolk and the Norfolk Police Division. Filing No. 1.

## BACKGROUND

Plaintiff Lori Colvey filed a lawsuit against the City of Norfolk, the Norfolk Police Division, Officer Jason Witzel, Officer Brent Tietz, and Sergeant Chad Reiman (hereinafter referred to as "defendants"). The City of Norfolk is a political subdivision and the Norfolk Police Division is a police department for the City of Norfolk. The other three defendants are officers who worked for the Norfolk Police Division. Plaintiff is a resident of Norfolk, Nebraska, who has a history of mental health treatment. At the time

of the incident on January 28, 2011, she was taking Wellbutrin and Prozac for her mental health issues. Previously, the police in Modesto, California, placed her in protective emergency custody in 1989 when she was in the yard of another looking for a friend. She also has a history of methamphetamine addiction.

On or about January 28, 2011, at approximately 6:41 p.m., Eric Stinson contacted the Norfolk police and reported that a female broke through the door of his wife's sewing showroom, at the rear of his home, and assaulted him and accused him of kidnapping her son. Mr. Stinson stated that he arrived home, and he asked plaintiff what she was doing. They knew each other previously and had taken classes together. Plaintiff started yelling that Mr. Stinson had her son. He let plaintiff into the sewing shop and allowed her to look around and determine that her son was not there. She then insisted on going through an internal door to the house. Mr. Stinson stated that the door had not opened in years. She attempted to open it anyway. Mr. Stinson then asked her to leave the shop, but she would not do so until she found her son. He then called the police.

Officer Tietz arrived and came in contact with the plaintiff. Then Officer Witzel and Sergeant Reiman arrived at the scene. The officers located plaintiff in the shop and asked her to exit. She would not leave the doorway, and she stated her son was inside. She eventually exited the doorway. Plaintiff continued to tell the officers that her son had been kidnapped and was being held against his will. She connected her missing son to a person with the name of Lacy Anderson, who had been missing for some time. She could not tell them why she believed this or where she lived. She led the officers to believe her son was young, when in fact he was 18. Officer Witzel asked her if she was

taking any medications, but she would not respond. The officers then tried to help plaintiff find her home. As they walked towards her home, she attempted to stop at other homes to search for her son.

The officers indicated they were concerned for plaintiff's safety, as they believed she was paranoid, thought her son was kidnapped, was willing to confront others, and generally they were concerned for her safety as well as others. As a result, they took the plaintiff into emergency protective custody, and they tried to take her to the hospital. Plaintiff refused to go, grabbed the railing on her porch, fought getting into the police car, and refused to exit the car. At some point prior to getting her into the car, the officers handcuffed the plaintiff. The officers then transported her to the hospital. Plaintiff later stated she believed the officers and nurses were brining her to the examination room to kill her.

The defendants contend the following. Officer Tietz walked into the examination room for a brief moment and then left to do his paperwork. He did not reenter the room until after the plaintiff's examination was fully conducted. The nurse asked plaintiff to get onto the bed, plaintiff resisted, and she was lifted onto the bed. She tried to lurch off the bed, her coat was then removed, and she was secured to the bed with one or more of the officers' handcuffs. The nurse tried to take plaintiff's vitals, be she resisted and threw her arms and kicked her legs, and generally resisted attempts at help. Plaintiff disagrees and states she was not combative. She also refused to answer questions. Officer Witzel stated that he stood on the left of the bed and held plaintiff's hand, trying to calm her down, throughout the examination. The physician's assistant ("PA") thereafter determined that plaintiff had an elevated heart rate, and believed she

3

exhibited bizarre behavior. He ordered a psychiatric panel of tests, including a blood draw and urine sample. Officer Witzel held plaintiff's hand during the blood draw.

The evidence is contested as to whether plaintiff was asked or agreed to give a urine sample. Defendants contend that the medical personnel asked plaintiff to give them a voluntary urine sample, and she told them to "fuck off." The PA ordered a quick catheterization to obtain the urine sample. Dr. Lisa Yosten signed off on the PA's order. Dr. Yosten stated that the catheterization and urinalysis were medically necessary because of signs of psychosis and the possibility of medication overdose. Dr. Yosten indicated that these tests were vital and medically necessary.

In order to do the catheterization, plaintiff's pants had to be removed. She resisted. Officer Witzel stated he believed the nurse removed plaintiff's pants and underwear. The nurse is unsure who removed plaintiff's clothing. Plaintiff states the officers removed her pants and were in the room while her upper body clothes were removed at some point. It appears that the officers might have assisted with the removal of plaintiff's clothes for the purposes of the medical catheterization. The nurse testified that following the removal of plaintiff's clothing, plaintiff's perineal area was visible to her and anyone else in the room. Officer Witzel and Sergeant Reiman stated they did not observe plaintiff's uncovered body because it was covered enough by a sheet. At some point, the officers discovered that plaintiff had a stocking cap and a Styrofoam plate in the crotch of her pants which was soaked in urine and blood from her menstrual cycle, although plaintiff does not remember this being the case, and there is nothing in the medical record regarding this statement.

4

During the quick catheterization process, Officer Witzel continued to hold plaintiff's hand and Sergeant Reiman stood by in case he was needed. Plaintiff contends that defendants forcibly pulled apart and restrained her legs in order to enable the nurse to insert a catheter into her pubic area. She further alleges the defendants utilized force in moving, restraining and subduing the plaintiff, and forcibly removing the clothing plaintiff wore, thereby exposing her body and causing her humiliation, anguish and pain, and fright. [Filing No. 1 at ECF p.4](#), Complaint. After the tests were complete, Officer Tietz returned to the room and stayed until they admitted the plaintiff. Officer Witzel and Sergeant Reiman left the hospital. Dr. Obatusin from the psychiatric hospital ordered the administration of Geodan, an antipsychotic, to the plaintiff, and then told them to recheck her blood pressure. She also received Narcan to reverse the effects of the methamphetamine-induced psychosis. Dr. Yosten then ordered that plaintiff be transferred to the behavioral health unit. Plaintiff contends her clothes were then cut off of her and she was placed into scrubs. No one else remembers her clothes being cut off of her. Plaintiff's blood pressure dropped, and Dr. Yosten then decided to admit her to the hospital. At that time Officer Tietz left the hospital.

At some point the officers also discovered that plaintiff was in possession of a substance that following an on-site test was identified as methamphetamine.

## STANDARD OF REVIEW

Summary judgment is appropriate when, viewing the facts and inferences in the light most favorable to the nonmoving party, "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed.

R. Civ. P. 56(c). The plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). "The movant 'bears the initial responsibility of informing the district court of the basis for its motion, and must identify 'those portions of [the record] . . . which it believes demonstrate the absence of a genuine issue of material fact.'" *Torgerson v. City of Rochester*, 643 F.3d 1031, 1042, (8th Cir. 2011) (en banc) (quoting *Celotex*, 477 U.S. at 323). If the movant does so, "the nonmovant must respond by submitting evidentiary materials that set out 'specific facts showing that there is a genuine issue for trial.'" *Id.* (quoting *Celotex*, 477 U.S. at 324). "The inquiry performed is the threshold inquiry of determining whether there is the need for a trial— whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986). A "genuine" issue of material fact exists "when there is sufficient evidence favoring the party opposing the motion for a jury to return a verdict for that party." *Id.* at 251-52 (1986) (noting the inquiry is whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law). If "reasonable minds could differ as to the import of the evidence," summary judgment should not be granted. *Id.* at 251.

The evidence must be viewed in the light most favorable to the nonmoving party, giving the nonmoving party the benefit of all reasonable inferences. *Kenney v. Swift*

6

*Transp., Inc.*, 347 F.3d 1041, 1044 (8th Cir. 2003). "In ruling on a motion for summary judgment, a court must not weigh evidence or make credibility determinations." *Id*. "Where the unresolved issues are primarily legal rather than factual, summary judgment is particularly appropriate." *Koehn v. Indian Hills Cmty. Coll.*, 371 F.3d 394, 396 (8th Cir. 2004).

## DISCUSSION

### A. Polices and Procedures

While the Norfolk Police Division has a policy regarding placing an individual in emergency protective custody, and all parties appear to agree that policy was followed, the police department does not have a policy on what procedures to follow while at the hospital. However, the hospital has a number of polices and procedures that apply when a person is placed in emergency protective custody. One of these policies provides that officers are to remain with emergency protective custody patients through the initial evaluation. Filing No. 53-9 at ECF pp. 11, 13, 14, 16 and 17, Ex. 8, Faith Regional Health Services Policies and Procedures. Such a patient is deemed a prisoner patient by the hospital. *Id.* at 16. As such, the police are required to guard them at all times. *Id*. at 14, 16, 17 and 32. When an officer brings an emergency protective custody patient to the hospital, the patient's initial evaluation includes any lab studies requested by the attending physician, a urinalysis, urine toxicology, and a blood alcohol content test, if needed. *Id.* at 1. Emergency room staff are not permitted to endanger themselves, and thus a police officer must accompany a possibly harmful patient. *Id.* at 14. Faith Regional Health Services' policies and procedures also state that, "[w]hen indicated for the safety and well-being of the patient or others, a restriction

7

of patient's rights may be imposed by the mental health professional in charge of the patient's treatment or the medical director of the program." *Id.* at 2.  Once medically stable, the officer must take the patient to the behavioral unit in the hospital. *Id.* at 11. If unstable, the admission with a "police hold" is one option. *Id.* at 11.  The hospital also has the right to ask the officer to stay with the patient during admission. *Id.*

### B.  Qualified Immunity

The law imposes civil liability on any person who "under color of any statute, ordinance, regulation, custom, or usage, of any State . . . subjects, or causes to be subjected, any citizen of the United States . . . to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws." 42 U.S.C. § 1983.  The principles of qualified immunity shield an officer from personal liability when an officer reasonably believes that his or her conduct complies with the law. *Pearson v. Callahan*, 555 U.S. 223, 129 S. Ct. 808, 823 (2009).  "Qualified immunity balances two important interests—the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Id.* at 815.  "Qualified immunity—which shields Government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights,'—is both a defense to liability and a limited 'entitlement not to stand trial or face the other burdens of litigation.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 672 (2009) (quotations omitted).  The defense "is usually raised by a motion for summary judgment after a limited amount of discovery has been conducted to determine whether defendants acted objectively in a reasonable manner and whether a plaintiff's rights were clearly established at the time

8

of the alleged deprivation." *Whisman v. Rinehart,* 119 F.3d 1303, 1309 (8th Cir. 1997). The qualified immunity defense is not available in an action to enjoin future conduct or in an action against a municipality. *County of Sacramento v. Lewis,* 523 U.S. 833, 842 n.5 (1998).

When summary judgment is sought on a qualified immunity defense, the court inquires whether the party opposing the motion has raised any triable issue barring summary adjudication. *Ortiz v. Jordan*, — U.S. —, —,131 S. Ct. 884, 889 (2011). To overcome the defendants' qualified immunity claims, a plaintiff must show that: "(1) the facts, viewed in the light most favorable to the plaintiff[s], demonstrate the deprivation of a constitutional . . . right; and (2) the right was clearly established at the time of the deprivation." *Baribeau v. City of Minneapolis*, 596 F.3d 465, 474 (8th Cir. 2010) (quoting *Howard v. Kansas City Police Dep't,* 570 F.3d 984, 988 (8th Cir.2009)); *Wilson v. Lawrence County*, 260 F.3d 946, 951 (8th Cir. 2001) (stating that the court addresses "whether, given a certain set of facts, [a plaintiff] states a valid constitutional claim," and whether the claim was clearly established at the time the alleged violation occurred."). For a constitutional right to be clearly established, its contours "must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Anderson v. Creighton,* 483 U.S. 635, 640 (1987); *Wilson,* 260 F.3d at 951 ("To be clearly established, there need not be a case decided on all fours with the present factual circumstances. Rather, it need only be apparent from pre-existing law that the conduct is unlawful."). Whether a constitutional right is clearly established is a legal question for the court to decide. *El-Ghazzawy v. Berthiaume,* No. 10-2058, slip op. at 10 (8th Cir. March 15, 2011).

9

The second step is a fact-intensive inquiry and must be undertaken in light of the specific context of the case, not as a broad general proposition. *Id.* A court may decide which qualified immunity prong to address first, in its discretion, "in light of the circumstances in the particular case at hand." *Pearson*, 129 S. Ct. at 818 (abrogating former mandatory two-step procedure announced in *Saucier v. Katz*, 533 U.S. 194, 200, that lower courts must first decide the "constitutional question" before they turn to the "qualified immunity question," the first inquiry being "whether a constitutional right would have been violated on the facts alleged"); *Baribeau*, 596 F.3d at 474 (finding it most beneficial to first address whether the facts, when considered in the plaintiffs' favor, establish a violation of the plaintiffs' constitutional rights). "Whether a given set of facts entitles the official to summary judgment on qualified immunity grounds is a question of law," however, "if there is a genuine dispute concerning predicate facts material to the qualified immunity issue, there can be no summary judgment." *Turney v. Waterbury*, 375 F.3d 756, 759-760 (8th Cir. 2004) (quotations omitted); see *Iqbal*, 129 S. Ct. at 1947 (noting that "determining whether there is a genuine issue of material fact at summary judgment is a question of law, but it is a legal question that sits near the law-fact divide"). A successful claim of qualified immunity will generally "present 'purely legal' issues capable of resolution 'with reference only to undisputed facts.'" *Ortiz*, 131 S. Ct. at 892 (noting that "[c]ases fitting that bill typically involve contests not about what occurred, or why an action was taken or omitted, but disputes about the substance and clarity of pre-existing law"); *see, e.g.*, *Behrens v. Pelletier*, 516 U.S. 299, 313 (1996) (stating "typically, the issue is whether the federal right allegedly infringed was clearly established"); *Johnson v. Jones*, 515 U.S. 304, 313-18 (reaffirming that summary

10

judgment determinations are appealable when they resolve a dispute concerning an "abstract issu[e] of law" relating to qualified immunity, not when the record raises genuine issues of fact); *Pearson*, 555 U.S. at 239 (noting that the qualified immunity procedure is of little use in fact-bound cases).

Even if a defendant frames an issue in terms of qualified immunity, the court should determine whether he is simply arguing that the plaintiff offered insufficient evidence to create a material issue of fact. *White v. McKinley*, 519 F.3d 806, 813 (8th Cir. 2008). The party asserting immunity always has the burden to establish the relevant predicate facts, and at the summary judgment stage, the nonmoving party is given the benefit of all reasonable inferences. *Id.* If there is a genuine dispute concerning predicate facts material to the qualified immunity issue, the defendant is not entitled to summary judgment. *Id.* The threshold question then is whether, viewed in the light most favorable to the plaintiff, the facts demonstrate that the defendants' conduct violated a constitutional right. *Id.* A defendant's good faith or bad faith is irrelevant to the qualified immunity inquiry. *Id.* The standard is one of "objective reasonableness." *Malley v. Briggs*, 475 U.S. 335, 344 (1986).

It appears from the record that plaintiff does not allege that the officers improperly took her into emergency police protective custody. The officers clearly have the authority to do so. Nebraska Mental Health Commitment Act, Neb. Rev. Stat. §§ 71-901 through 71-963 (particularly § 71-919). It seems her complaint focuses entirely on the allegations that the male officers restrained her during catheterization and assisted with the removal of her clothing.

With the immunity issues in mind, the court will next determine whether plaintiff has submitted any evidence of a violation of her constitutional rights.

### C. Negligence/Excessive Force (Officers in their Individual Capacities)

#### (1) Negligence (State Law)

Defendants argue that these claims fail as a matter of law pursuant to the Political Subdivisions Tort Claims Act ("PSTCA"). Where an officer or employee of a political subdivision is sued in his or her individual capacity, but is performing within the scope of his or her employment as a government official, the requirements of the PSTCA apply, and the individual is immune unless the state has expressly waived its sovereign immunity. *Bojanski v. Foley*, 18 Neb. App. 929, 939, 798 N.W.2d 134, 144 (2011). The PSTCA waives immunity for certain tortious conduct, but expressly reserves immunity for "[a]ny claim arising out of assault, battery, false arrest, false imprisonment, malicious prosecution, abuse of process, libel, slander, misrepresentation, deceit, or interference with contract rights." Neb. Rev. Stat. § 13-910(7).

The court agrees that the legislature has not expressly claimed immunity for negligence lawsuits under § 13-910(7). However, in the alternative, defendants argue they are entitled to immunity because when, in the scope of employment, immunity applies from any claims "based upon an act or omission of an employee of a political subdivision, exercising due care, in the execution of a statute, ordinance, or officially adopted resolution, rule, or regulation, whether or not such statute, ordinance, resolution, rule, or regulation is valid." Neb. Rev. Stat. § 13-910(1). Therefore, defendants contend that because they were exercising due care under Nebraska

12

statutes, departmental rules, and hospital rules, they are immune from suit. The court agrees. It is clear the officers followed the statute for protective custody, the police department rules, and the hospital rules. Accordingly, the court agrees the defendants are immune from suit for negligence.

Regardless of whether immunity is waived in this case, plaintiff states no cause of action for negligence in any event. Plaintiff contends that the defendants were negligent. The court disagrees and finds that these allegations do not support any kind of claim for negligence. Further, the court finds there is no constitutional claim in this regard. In this case the officers clearly believed plaintiff was a danger to herself and others. They acted in a reasonable way to assure the safety of all. The court finds there is no state law negligence claim. *See Tinius v. Carroll County Sheriff Department, 321 F. Supp. 2d 1064, 1085 (N.D. Iowa 2004)* (man picked up on side of road believed by officers to be a danger to himself and others, and court stated "the officers' actions were taken to protect [the plaintiff] from personal harm, which is in keeping with the duty they owed to [the plaintiff]." The Iowa court granted summary judgment on the negligence claim, finding that the analysis under the Fourth Amendment reasonableness clause to be the appropriate one. The court will do likewise in this case. There is no waiver of immunity, and even if a waiver existed, there is no evidence of negligence or breach of duty on the part of the defendants in this regard. It is clear defendants have the right to take plaintiff into protective custody. It is also clear they exercised due care in their duties. Thus, the claim for negligence against the officers in their individual capacities must be dismissed.

### *(2) Excessive Force*

Plaintiff further contends that the defendants used excessive force in violation of the Fourth Amendment to the United States Constitution when restraining her in the hospital and when removing her clothing. Plaintiff asserts that defendants held her mouth open for the nurse, and left a bruise on her neck. Further, she argues that during the catheterization defendants held her legs and touched her thighs and used excessive force in doing so. Also, she contends she was handcuffed to her bed.

"'Claims of excessive force are evaluated under the reasonableness standard of the Fourth Amendment.'" *Johnson v. Carroll*, 658 F.3d 819, 825-26 (8th Cir. 2011) (quoting *McKenney v. Harrison,* 635 F.3d 354, 359 (8th Cir.2011)). "'To establish a constitutional violation under the Fourth Amendment's right to be free from excessive force, the test is whether the amount of force used was objectively reasonable under the particular circumstances.'" *Id.* (quoting *Brown v. City of Golden Valley*, 574 F.3d 491, 496 (8th Cir. 2009). Courts must "'determine whether a use of force was reasonable by balancing the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake.'" *Id.* (quoting *McKenney*, 635 F.3d at 359). "The 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Id.* (quoting *Graham v. Connor*, 490 U.S. 386, 396 (1989)). Thus, argue defendants, plaintiff's claims of excessive force are immune from suit.

Based on the facts presented by both parties, plaintiff has not submitted adequate evidence of excessive force under the circumstances so as to enable the court to submit it to the trier of fact. Further, plaintiff has failed to establish a

14

constitutional violation in this regard. In the alternative, the court finds that even if it could construe some type of constitutional violation, plaintiff has failed to show that such right was clearly established. It is not apparent from pre-existing law that defendants' conduct is unlawful. In fact, the *Tinius* case supports the actions of the officers. Based on the facts of this case, the court finds as a matter of law that (1) plaintiff does not state a valid constitutional claim for relief, (2) that the alleged constitutional violation is not clearly established, (3) that defendants are entitled to qualified immunity, and (4) the facts when viewed in plaintiff's favor fail to create a material fact for trial, as the officers behaved in a reasonable manner under the circumstances. For all these reasons, the court finds the excessive force claim should be dismissed.

### D. Catheterization and Right to Privacy (State and Federal Law)[1]

Plaintiff claims the officers forcibly removed her clothing, they stayed in the exam room while she had no clothing, and they forcibly restrained her during the catheterization. The right to privacy is not covered by Neb. Rev. Stat. § 13-910(7). However, as previously stated herein with regard to the negligence claims, defendants arguably have state law immunity. In the alternative, to the extent that this is a state law claim, and assuming no immunity, the court agrees with the defendants that (1) plaintiff has not alleged any intrusion in a place of solitude or exclusion, Neb. Rev. Stat. § 20-203, and (2) the statute of limitations has expired under Neb. Rev. Stat. § 20-203 ("An action for invasion of privacy must be brought within one year of the date the cause of action arose."). Neb. Rev. Stat. § 20-211. This case was filed on January 3, 2013, and

---

[1]The court first notes that plaintiff has not stated the basis for her right to privacy.

the case arose on January 29, 2011. Accordingly, the court finds the state law privacy claim, if any, is dismissed.

With regard to a federal cause of action, the court agrees with the defendants that the facts show the catheterization was performed solely for the benefit of the plaintiff as ordered by medical personnel. *See Levine v. Roebuck*, 550 F.3d 684, 685 (8th Cir. 2008) (inmate forced to undergo catheterization when he could not provide urine sample for random drug test did not violate the Fourth Amendment.) Further, in the case at hand, the officers brought plaintiff to the hospital for her own health and safety. They did not bring her with the idea of criminal charges in mind. *Sullivan v. Bornemann*, 384 F.3d 372, 373-74 (7th Cir. 2004) (court distinguished facts where plaintiff catheterized while officers held his arms and legs to ensure medical well being, versus instances where law enforcement trying to collect evidence). There was no search for evidence. The urine was taken for purely medical reasons. *See also Tinius,* 321 F.Supp.2d at 1075 (where court determined that the inquiry is whether the officers acted reasonably when they restrained plaintiff to obtain a urine sample by means of catheterization to assist with the caretaking function for the individual.)

As the court has previously found with regard to the excessive force claim, defendants did not violate plaintiff's constitutional rights and defendants clearly acted reasonably under the circumstances. Further, even if she had a constitutional right, such rights in this context are not clearly established by pre-existing law. The court finds that: (1) plaintiff does not state a valid constitutional claim for relief under state or federal law, (2) that the alleged constitutional violation is not clearly established, (3) that defendants are entitled to qualified immunity, and (4) the facts when viewed in plaintiff's

16

favor fail to create a material fact for trial. For all these reasons, the court finds this claim should be dismissed.

### E. Municipal Liability

Plaintiff also alleges claims against the City of Norfolk, the Norfolk Police Division, and the officers in their official capacity. Such claims are similar in nature and will be addressed together.[2] See *Liebe v. Norton*, 157 F.3d 574, 578 (8th Cir. 1998) (citing *Hafer v. Melo*, 502 U.S. 21, 25 (1991)); see also *Hess v. Ables*, 714 F.3d. 1048, 1054 (8th Cir. 2013) ("a municipality can be liable under § 1983 only "if an action or policy itself violated federal law, or if the action or policy was lawful on its face but 'led an employee to violate a plaintiff's rights [and] was taken with "deliberate indifference" as to its known or obvious consequences.'" ) (citations omitted). Plaintiff argues that the City of Norfolk is negligent in failing to properly train, hire and supervise the defendants. Further, plaintiff asserts that the City of Norfolk was negligent in failing to promulgate policies and procedures to cover these situations.

The court disagrees. First, with regard to the negligence claim, the plaintiff has failed to state a claim against the City and the police department. There is no showing that a duty to the plaintiff was breached, and there is no showing of any negligence on the part of the City defendants. Further, with regard to the failure to hire, train, supervise and discipline its officers, and failure to establish policies, the court finds no constitutional claim pursuant to 42 U.S.C. § 1983. The City and police department did have policies in place for protective custody. The officers followed these policies. Plaintiff has shown no right to any additional constitutional safeguards, and as

---

[2] The court has already determined that plaintiff has not stated a claim for negligence against the officers.

previously determined by this court there are certainly no clearly established rights violated by the officers or the City defendants.

With regard to the failure to hire, train and supervise in violation of 42 U.S.C. § 1983, the court likewise finds there is no liability against these defendants. "A municipality can be liable under § 1983 only 'if an action or policy itself violated federal law, or if the action or policy was lawful on its face but led an employee to violate a plaintiff's rights [and] was taken with deliberate indifference to its known or obvious consequences.'" *Hess,* 714 F.3d at 1054. The court has already determined that there is no Fourth Amendment violation, as there was not a clearly established right and the officers themselves did not violate any rights of the plaintiff. Accordingly, the court finds no deliberate indifference on the part of the City of Norfolk.

The court finds there is no official liability attributable to the officers or any municipal liability attributable to the City of Norfolk or the Norfolk Police Division.

THEREFORE, IT IS ORDERED that the defendants' motion to dismiss, Filing No. 51, is granted. This case is dismissed and a separate judgment will be entered in accordance with this Memorandum and Order.

Dated this 22nd day of January, 2014.

BY THE COURT:

s/ Joseph F. Bataillon
United States District Judge